

**UNITED STATES POSTAL SERVICE**
**OFFICE OF INSPECTOR GENERAL**

### MEMORANDUM OF INTERVIEW

| Interview Date: | 6/27/2018 |
|---|---|
| Case Name: | BERLUCCHI, THOMAS, G, FACILITIES ENGINEER, FACILITIES REPAIR & ALTERATION (WEST), FERNDALE, MI 48220 |
| Case Number: | 16UISL1420CF02CF |
| Interviewee: | THOMAS BERLUCCHI |
| Interview Location: | FERNDALE, MI POST OFFICE, 22681 WOODWARD AVE, FERNDALE, MI 48220 |
| Interviewed By: | SA KEVIN CLONINGER AND SA KIMBERLY SHIELDS |
| Witnesses: | N/A |

On June 27, 2018, Special Agents Kevin Cloninger (SA Cloninger) and Kimberly Shields (SA Shields) interviewed Thomas Berlucchi (Berlucchi), Facilities Engineer, at his office located inside the Ferndale, MI Post Office. SAs Cloninger and Shields identified themselves to Berlucchi and asked him if he would be willing to answer questions from the agents. Berlucchi agreed to the voluntary interview and provided the following information in substance:

Before the interview began, SA Cloninger advised Berlucchi of his Garrity Rights. SA Cloninger read the Garrity Rights waiver form to Berlucchi and asked him to initial each section and sign the form if he understood his rights. Berlucchi initialed and signed the form and stated he understood the rights (**Attachment 1**). SA Cloninger explained to Berlucchi that this was a voluntary interview and he could stop the interview at any time. SA Cloninger further explained to him that the agents were in his office and he could stop the interview at any time and ask the agents to leave his office. Berlucchi acknowledged that he understood and told the agents, "I've got nothing to hide."

Berlucchi explained he came over to the Facilities Services Office (FSO) on a detail from about 2010 – 2012 and his FSO position became a permanent position about four years ago. The FSO structure and responsibility has changed during that time, but Berlucchi still does Article 32 and assigns work to the contractors for postal facility repairs.

Page 1

| RESTRICTED INFORMATION | This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution. |

Berlucchi explained his role in the postal facility repair process. Berlucchi receives a message generated from the Facilities Single Source Provider (FSSP) line on a problem at a Post Office in his geographic area of coverage. Berlucchi primarily covers the Greater Michigan District in his roll with the FSO. He also backs up other facility engineers for other districts and states. Berlucchi is also on a national coverage team for collection box unit (CBU) slab work. The notification that Berlucchi receives from the FSSP line indicates there is a problem at a post office and the postal official is requesting a repair.

Berlucchi related he could show the agents how he receives the requests and what he does on a current matter. Berlucchi showed the agents his computer and an email from the Lake Linden, MI Postmaster. The email was a maintenance request for the Lake Linden dock lift repair due to flooding. The Lake Linden office had bad flooding and the dock lift was not working. Lake Linden is a leased building, but the Postal Service owns the dock lift. Berlucchi talked to the Lake Linden Postmaster to make sure the site is cleaned up and safe to send contractors for repairs. Berlucchi explained he would send this call to a job order contract (JOC) contractor because he thinks the job will be over $10,000.

Berlucchi advised he has control over picking the contractor for any job under $10,000. Anything over $10,000 will have to go to a JOC contractor and the Northern Contract Management Team (CMT) handles that contract. Berlucchi enters the jobs estimated over $10,000 into the eGordian system and that program has an estimator.

Berlucchi explained with the Lake Linden call, he will forward the email with the identified problem from the postal official on-site to a JOC contractor. In that email, he will explain to the contractor that any repair over $2,000 will have to be sent to him for approval. Berlucchi showed the agents on his computer that he has standard language in a word file that he copies and pastes to the email message to the contractor. The contractor that is assigned the job can make any repairs under $2,000 without Berlucchi's approval. The contractor will make the repair under $2,000 and then send the invoice to Berlucchi for his approval.

Berlucchi showed the agents an invoice dated May 11, 2018, from ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in the amount of $1,726.38 (**Attachment 2**). This job was for the repair on the impact door #1 at the Manchester, MI Post Office. This was the type of job that Berlucchi would assign a contractor like ▓▓▓▓▓▓▓ to observe the requested repair and when ▓▓▓▓▓▓▓ estimated the repair cost for under $2,000; they would make the repair without any additional approval needed. ▓▓▓▓▓▓▓ ran the postal Visa credit card assigned to Berlucchi in their credit card terminal and Berlucchi would note the charges and work notes in eFMS. ▓▓▓▓▓▓▓ sent in the invoice and credit card receipt. Berlucchi approved the invoice and credit card charge by ▓▓▓▓▓▓▓.

Page 2

RESTRICTED INFORMATION   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

The invoice packet for the ▓▓▓▓▓▓▓ job included ▓▓▓▓▓▓▓ invoice #246, credit card receipt, Repair and Alterations Local Buy Agreement (LBA) (For Work Under $10,000), Great Lakes FSO Response Line FSSP Problem Work Sheet, ▓▓▓▓▓▓▓ proposal #1144 dated May 8, 2018, and photos of the issue. Berlucchi explained he included the LBA with this job, but he did not have to because it was below $2,000. For jobs over $2,000 and below $10,000, the LBA is required. Berlucchi advised he includes the LBA with all repair jobs because it provides language for a warranty. Berlucchi pointed out the portion of the LBA that read, "All workmanship and material shall be warranted for one year after acceptance."

For the jobs Berlucchi assigned between $2,000 and $10,000, he sent the contractor he selected a packet of information via email that included a lead paint certification, Davis Bacon Act information, U. S. Department of Labor (USDOL) required wages, and the LBA. The LBA was completed and finalized by the contractor at the end of the work.

Berlucchi stated he received a proposal and estimate for jobs between $2,000 and $10,000 before he authorized the contractor to perform the work. The agents asked Berlucchi if he always received a bid before the job was completed, Berlucchi stated, "I have to." The bid proposals contained a breakdown of subcontractor's costs. Berlucchi advised the bid proposals did not have to contain the bid information from the subcontractor if one was going to be used. The subcontract amount was just a line item in the general contractor's bid proposal. Berlucchi stated the general contractor is responsible for overseeing the work of the subcontractor.

When Berlucchi received a work request from the FSSP system, he emailed the contractor that he thought would be able to complete the job. Berlucchi has experience with the contractors in the Michigan area and knows which contractors are strong in different areas and repairs. Berlucchi also copied the postmaster of the facility on the email to the contractor so the postal official knew who was coming out for the repair. Berlucchi explained the bad part for him was he only knew what the postmaster or postal official reported as the problem. Berlucchi was not able to go out and see the problem. Berlucchi sent the repair problem to the contractor he selected and the contractor traveled out to review the problem and generated a cost proposal. Berlucchi stated the contractor must go out and evaluate the problem and he expected the contractor to put "eyes on the project" and Berlucchi relied on the information from the contractors.

Berlucchi described the Upper Peninsula (UP) in Northern Michigan as a "different world." Berlucchi stated the contractors up there do not take credit cards and Berlucchi had to pay contractors by credit cards. Berlucchi also explained some of the contractors only go certain places based on geographic agreements with the other contractors. Berlucchi stated that Horizons Materials and Management (Horizons) have "saved our butts" in the UP. Berlucchi related the UP is so unique he has tried to have two or three

Page 3

general contractors form relationships with subcontractors in the UP. Berlucchi stated it costs more to have just a few contractors up there, but it saves the Postal Service in the long run because there are less return calls. From the FSO, Berlucchi, ▓▓▓▓▓▓▓, and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓, assign work in the UP. Some of the distances can be 10+ hours away from the Detroit area.

The contractors had to submit a proposal before they perform the work. All contractors did their paperwork differently and the proposals were all different. Berlucchi sent the email notification to the contractor he chose and the contractor went to the site to review the job. Berlucchi and the contractor communicated by email and phone about the project. Berlucchi stated he approved the job when the contractor looked at the problem and gave Berlucchi a proposal. Berlucchi explained he told the contractor to go ahead with the work by phone or email and sent them the LBA package with all the required paperwork. Berlucchi explained he told contractors to proceed verbally over the phone or in person once he evaluated the proposal. Some of the contractors come in to the Ferndale, MI office and meet with Berlucchi face to face. Berlucchi noted ▓▓▓▓▓ from ▓▓▓▓▓▓▓▓ and ▓▓▓▓▓ come in to the office.

Berlucchi showed the agents a completed job packet from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ under invoice 996 dated March 23, 2018 (**Attachment 3**). The repair job was for a replacement of Edge of Dock (EOD) dock leveler on dock #8 at the Grand Rapids Processing and Distribution Center (P&DC). The invoice was for $7,236.72 and other documents in the job packet included:
- Credit card receipt from ▓▓▓▓▓ for $7,236.72,
- Completed LBA signed by ▓▓▓▓▓ and Berlucchi,
- Contractors release signed by ▓▓▓▓▓,
- Certificate of Asbestos and Lead-Based Paint,
- USDOL certified payroll form ▓▓▓▓▓▓▓▓▓▓,
- USDOL certified payroll form ▓▓▓▓▓▓▓▓▓▓,
- Great Lakes FSO Response Line FSSP Problem Work Sheet signed by Berlucchi,
- Photos of reported issue,
- LBA with top portion completed, but unsigned,
- ▓▓▓▓▓ proposal to the Postal Service dated December 15, 2017 under call 2200013,
- ▓▓▓▓▓▓▓▓▓▓▓▓ proposal to ▓▓▓▓▓ dated December 13, 2017,
- ▓▓▓▓▓ proposal to ▓▓▓▓▓ dated November 28, 2017,
- Government Cost Estimate dated December 15, 2017, and
- Postal Service Work Acknowledgement Letter signed by ▓▓▓▓▓▓▓ and dated March 22, 2018.

Berlucchi explained ▓▓▓▓▓ from ▓▓▓▓▓ goes above and beyond with his paperwork and sends in bid sheets for the subcontractors he uses. ▓▓▓▓▓ even sends in the USDOL wage certifications for his subcontractors. Berlucchi explained the

Page 4

RESTRICTED INFORMATION   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General.  This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General.  Unauthorized release may result in criminal prosecution.

subcontractor bids and USDOL paperwork for the subcontractors is not required. The general contractor is responsible for the subcontractors and making sure the required Davis Bacon wages are paid.

SA Cloninger asked Berlucchi about the ▆▆▆▆ proposal for the EOD work at Grand Rapids. On ▆▆▆▆'s proposal, there were two line items for subcontractor, one for ▆▆▆▆ for $5,170 and one for ▆▆▆▆ for $872. SA Cloninger asked Berlucchi if he expected the line items in the general contractor's proposal and invoice regarding subcontracting cost to be accurate. Berlucchi stated he expected all costs to be accurate. If a general contractor was able to subcontract out the work for less, Berlucchi expected the general contractor to give the reduced cost to the Postal Service. Berlucchi stated he relied on the information provided by the general contractor and approved the expenditures with the understanding the costs provided to him as the postal official were accurate. SA Cloninger asked Berlucchi on this particular job, just as an example, if ▆▆▆▆ had subcontracting costs for ▆▆▆▆ of only $3,000 instead of the reported $5,170, would that be important to him as a postal official. Berlucchi stated it would be important and he relied on the amount of subcontracting cost submitted by the general contractor. If the subcontracting cost was less, the lesser amount should be provided to the Postal Service. Berlucchi stated he expected the proposals and invoices to be accurate and made his approvals based on the belief they were accurate.

Berlucchi described the general contractors he worked with as honest people and he has worked with them for years. Berlucchi has gotten rid of contractors in the past because they were not good. Berlucchi explained the general contractor is allowed about a 12% profit on the subcontracting costs and other costs for the job. On the ▆▆▆▆ proposal there was a line item for ▆▆▆▆ Fee of $611.52. Berlucchi explained that would be the allowed profit amount for the job.

SA Cloninger asked Berlucchi if he ever told a general contractor to inflate the amount of the subcontracting costs to cover other expenses of the job. Berlucchi stated he would never allow the contractor to add money on the proposal or invoice to cover other parts of a job. The general contractors are allowed their expenses and those were on the proposal and invoices. The subcontracting costs should be what the general contractor paid the subcontractor for the work performed. If that amount was less than originally estimated, Berlucchi expected the Postal Service to be billed the lesser of the amount. Berlucchi relied on the general contractor's proposal and invoice for the costs associated with the job. Berlucchi stated he does not always get the subcontractors proposal, so he relied on what the general contractor submitted to him. Berlucchi stated he did not allow a contractor to bid a job at a level and then find a way to do the job for less, but still pay them at the higher level. Berlucchi expected the costs submitted by the general contractor to be accurate and he relied on that information when he approved the invoices for payment.

RESTRICTED INFORMATION   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General.  This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General.  Unauthorized release may result in criminal prosecution.

Berlucchi explained postal contractor EMCOR does the same thing. EMCOR goes out and finds the subcontractor to do the work and then charges a fee on top of the work. Berlucchi explained EMCOR acts like a general contractor.

Berlucchi showed the agents a copy of proposals from _____ for about four jobs:
- Pewjiak – Approximately $22,000,
- Greenville – Approximately $38,783 - $42,662,
- Battle Creek – Approximately $27,440.15 - $30,184.17, and
- Caledonia – Approximately $11,448.36 - $12,489.12.

Berlucchi showed the agents how he used the eGordian computerized system. For jobs over $10,000, Berlucchi entered the information in eGordian and the system used an estimator to identify the expected costs. That estimate was then provided to the Northern CMT for a contract with a JOC contractor.

Berlucchi sent the general contractors the USDOL wage rates that are required for the jobs. Those are pulled from WageDeterminationsOnLine.gov. Berlucchi sent that information to the general contractor he selected to do the job. Berlucchi stated the subcontractors have to be paid at the required USDOL determined wages as a minimum, but Berlucchi stated, "most guys pay subs way more." Berlucchi does not verify the wages and amounts paid to the subcontractors. The general contractor turns in the wages for the work they do. Some general contractors like _____ send in the USDOL wage forms for the subcontractors, but Berlucchi does not always get that from other general contractors. Berlucchi relied on what the general contractor submitted to him for subcontractor costs for those.

SA Cloninger asked Berlucchi about the general contractor he used in the UP named Horizons and if they sent in USDOL wage forms for subcontractors. Berlucchi could not recall what Horizons sent in and identified the owner as Mike Rymar (Rymar). Berlucchi looked through his files and pulled a completed job packet from Horizons containing Horizons invoice #3-3/18 dated March 5, 2018 for emergency docklift repair work at the Iron River, MI Post Office (**Attachment 4**). The invoice contained line items:
- Labor - $260,
- Material - $280,
- Subcontractor - $2,850,
- Profit - $271.
- Total - $3,661.

Berlucchi reviewed the packet and identified that Rymar did not submit any subcontractor estimates or USDOL wage forms. The proposal noted subcontract work with _____ for $2,850 and had Horizons fees of 8%. The packet also contained a form Statement to be Submitted When Work is Performed Personally (Performed Personally). On that form SA Cloninger asked Berlucchi who was _____ as she was noted as the owner and Michael Rymar as partner. Berlucchi explained _____

Page 6

RESTRICTED INFORMATION    This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

▓▓▓▓▓ is Rymar's wife and they own the company together. Berlucchi explained this form was submitted for this job because Rymar claimed he did the work himself for Horizons and not with other Horizons employees. The packet also contained a form titled Job Work Order with the Horizons header. Berlucchi explained this was the form Rymar used to verify the work was completed at the Post Office. SA Cloninger noted that form was different than the Postal Service work verification form contained in the ▓▓▓▓▓ packet. Berlucchi advised that was the form that Rymar used and one that he created.

Berlucchi noted the subcontractor in the proposal was noted as ▓▓▓▓▓. On the invoice the subcontractor line item amount was $2,850. Berlucchi noted there was no other subcontractor proposal or USDOL payroll forms for the subcontractor in the packet. The Horizon fees were noted as 8%. Berlucchi explained that was Horizons' profit rate on the job and Rymar charged that for both his work and the subcontractor work. SA Cloninger asked Berlucchi if Rymar paid the subcontractor less than $2,850 would that be important to him in making a decision on whether to approve the payment. Berlucchi stated the invoice should show what was paid to the subcontractor and it would be important to him in determining the cost of the job. Berlucchi stated the price seemed reasonable, but he had no way to verify what was paid to the subcontractor.

Berlucchi stated if a general contractor was always right below $10,000 that could indicate fraud and he would be more suspicious of them. Berlucchi noted that some of the general contractors he used might keep their bid proposals under $10,000 to keep the work. Any bids over $10,000 go to the Northern CMT and will be assigned to a JOC contractor. Some of the JOC contractors are ▓▓▓▓▓ ▓▓▓▓▓ Berlucchi demonstrated how he entered a $17,000 bid into eGordian and then it created the estimate of approximately $33,000. Berlucchi explained the $33,000 will be the amount awarded to the JOC contractor by the Northern CMT. The contracting officer at the Northern CMT is ▓▓▓▓▓ Berlucchi does not award the contracts over $10,000, but he serves as the contracting officer representative (COR). The Gordian system charges about a 1.95% fee for jobs that go through JOC and about 5.9% for jobs that go through HubWorks. Berlucchi explained he generated the approval for the payments for jobs over $10,000, which are paid out of San Mateo. Berlucchi signed off of the work and then it went to his team leader, ▓▓▓▓▓ then verified the information and the payment was made.

There is also a national postal contractor called EMCOR that functions similar to what Berlucchi does. Berlucchi explained he can assign every job that comes to him to EMCOR. Berlucchi will not use EMCOR unless he is given a direct order. Berlucchi explained he has caught EMCOR in lies and he does not have a good relationship with them. They cannot get the jobs done within his performance goals of work completed between 45-60 days and the work is not good. Berlucchi was worried about taking care of his district and the level of work he provided was better than EMCOR. Berlucchi knew what contractors can do what in the areas he covered. Berlucchi advised EMCOR was

Page 7

RESTRICTED INFORMATION   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

good in areas like Chicago, Detroit, or Cap Metro, but not good for rural areas. The contractors have to get approved by EMCOR to be in their system and pay a fee to be part of EMCOR. EMD Construction is an EMCOR contractor. Horizons is not an EMCOR contractor. EMCOR has other contracts in addition to the Postal Service and the contractors do other non-postal work through EMCOR. Berlucchi signed off on the EMCOR work and he was liable for the completion of the work. EMCOR jobs show as "FRASS" in eFMS.

If Berlucchi assigned roofing work he only used ▓▓▓▓▓▓ in Greater Michigan. Berlucchi said he use them "not because I'm trying to build his business," but that he trusted the roofing work they do. There was a national roofing contractor called ▓▓▓▓▓▓. Berlucchi showed the agents how he certified the work in eFMS for ▓▓▓▓▓▓. Berlucchi opened eFMS and selected the roofing job, selected edit, payments, and then hit the "$" sign. Those steps opened the ▓▓▓▓▓▓ invoice. Berlucchi reviewed the information and verified the postmaster signed the work completion form. Berlucchi will then approve and a payment request is then sent to ▓▓▓. ▓▓▓ then verifies the information and the payment is made to ▓▓▓

Berlucchi advised he wanted to use the local contractors to do the jobs and by using general contractors like Horizons he could do that. Berlucchi stated the local contractors do not take credit cards and that was how he has to pay for the work. Berlucchi stated he was stuck here and cannot go out to see the work. Berlucchi said there should be an facilities engineer physically located in each district. Berlucchi's area covered northern and western Michigan and he was also on the CBU slab team nationally. Berlucchi had to rely on what the postal official said was the problem and what the contractor sent back in photos. Berlucchi said it was not ideal and he was doing the best he can.

Berlucchi explained the JOC contractors did work all over the country. Some of the contractors that Berlucchi used in Michigan did work in other states. ▓▓▓▓▓▓ did work all over. Horizons did work all over including Ohio and West Virginia. ▓▓▓▓▓▓ had those locations and assigned jobs there to Horizons.

Berlucchi explained some contractors only do work in certain locations and won't cross boundaries. Two contractors Berlucchi noted like that were ▓▓▓▓▓▓ and ▓▓▓▓▓▓, both in the UP.

Berlucchi met Mike Rymar around 1991 when he replaced a dock door at the Pontiac, MI plant. Berlucchi was the maintenance manager there and Rymar worked for his family business American Material Handling (AMH). Rymar split off from AMH and it was a family thing. Berlucchi stated he started to use Horizons with Rymar because his quality of work. When Rymar had Horizons he settled Berlucchi's UP issue. Berlucchi explained he can pay Horizons and Rymar for work, but he cannot pay the contractors

Page 8

RESTRICTED INFORMATION   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General.  This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General.  Unauthorized release may result in criminal prosecution.

that do not take credit cards. So then Rymar can pay those contractors he used as subcontractors.

Berlucchi stated he was aware of the records request from the USPS OIG for jobs completed by Horizons and Rymar. Berlucchi had to copy the documents for the request. Berlucchi stated he did not tell or talk to Rymar about the request or notify him there was a request. Berlucchi stated he kind of figured this was where all this was leading to.

SA Cloninger explained to Berlucchi that he wanted to ask him about some specific jobs that Rymar completed for the Postal Service. SA Cloninger showed Berlucchi a completed Horizon job packet containing Horizon invoice 14-9/17 dated September 18, 2017 (**Attachment 5**). The job related to a hot water tank at the Marquette, MI Post Office. Berlucchi explained that he got the request in for the repair and then sent it to Rymar. Rymar met with the postal staff and then Berlucchi said "then we make the proposal." SA Cloninger asked Berlucchi if he ever helped Rymar with preparing bids. Berlucchi stated, "No, we never had that conversation, ever."

Berlucchi noted this job was paid on January 11, 2018. SA Cloninger pointed out the proposal was dated September 14, 2017 and the start date on Horizons Job Work Order was September 15, 2017. Berlucchi's Government Cost Estimate sheet was dated December 29, 2017 and Berlucchi's note in eFMS said he sent the LBA package on December 30, 2017. Berlucchi stated that Rymar takes forever with paperwork and that is why he does not like using him anymore. Berlucchi reiterated that Rymar is terrible with paperwork. Berlucchi stated he can guarantee that he gave Rymar the ok to do the work before he sent the LBA paperwork on December 30th. Rymar emailed in the job proposal or brought them in to his office. Berlucchi stated he "absolutely" had Rymar's proposal before the work was started and he approved.

Berlucchi said he is a "slacker" too and he might not send the LBA package quickly, but the work was done on September 21, 2017. Berlucchi said he needed to put more notes in eFMS on what he did and he was told that before. Berlucchi was not sure when he spoke to Rymar or when the work was completed, but said it was somewhere between September 13 and September 21. Berlucchi asked to take a break and he left the office and returned a short time later and said he was willing to continue with the interview.

Berlucchi explained Rymar would have been onsite at Marquette to evaluate the job and determine the proposal. Rymar, or someone from Horizons, would also have taken the photos of the job. The Government Estimate form was completed by Berlucchi. Berlucchi explained that form was supposed to be completed for every job, but Berlucchi said he was going to be honest and did not do it for every job. Berlucchi said, "I'm one guy." Berlucchi stated he completed and sent the LBA and completed the Government Estimate form on December 29, 2017. Berlucchi based the Government Estimate form on the proposal submitted by Rymar.

RESTRICTED INFORMATION   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Berlucchi thought the work was maybe completed on September 15, 2017 and he might have talked to Rymar on September 14, 2017 and authorized Rymar to proceed. Berlucchi noted the postal official signed Rymar's Job Work Order form that was dated September 15, 2017. Rymar used his own form for the postal official to sign and did not use the postal form that Berlucchi sent out with the LBA package.

Berlucchi explained on this job he sent an email to Rymar about the call and asked if can cover it. Rymar was required to go out to the Post Office and evaluate the job and prepare the bid. Berlucchi then approved the proposed bid and told Rymar to complete the work. Rymar then completed the required documents (completed LBA, asbestos and lead paint form, wage certifications or personal work declaration, and contractor release). Rymar also submitted his invoice for the job to Berlucchi. SA Cloninger noted on the invoice a line item for "Subcontractor" and it had the amount of $6,758.00. SA Cloninger asked Berlucchi if the subcontractor amount on the invoice was important to him when he made his decision to approve the payment to Rymar. Berlucchi explained he made sure what they agreed to was the same as the invoiced amount, so that the proposal matched the final invoice. SA Cloninger asked Berlucchi if it would be important to him to know if Rymar paid the subcontractor less than $6,758 for the work. Berlucchi stated yes it would be important.

SA Cloninger showed Berlucchi invoice #81476 dated September 22, 2017, and payment receipt from                                (**Attachment 6**). The invoice showed      billed Horizons approximately $3,447.75 for gas water heater repairs at the Marquette, MI Post Office with a service date of September 15, 2017. SA Cloninger asked Berlucchi to review the description of work on the      invoice and Berlucchi confirmed that appeared to be the same job the Horizons was paid for. SA Cloninger noted that Horizons was paid over $9,000 for the job that appeared to be completed by      for approximately $3,447. Berlucchi stated that was what it looked like to him too, but he never saw the subcontractor invoice. Berlucchi stated he does not trust any of these guys now.

Berlucchi stated the Postal Service should have got the lower subcontract amount and he would not have approved the invoice and payment if he knew the subcontractor was only paid $3,447, but postal was billed by Rymar over $9,000. Berlucchi stated he had never seen the subcontractor information before. Berlucchi stated this just "totally destroyed" his trust with the contractors and called this "very disturbing." SA Cloninger asked Berlucchi if he ever told Rymar to add cost to the invoice. Berlucchi stated, "No, absolutely not, I never told that to anybody." Berlucchi stated the cost for this job did not look outrageous. Berlucchi said he has to change what he is doing and this is disturbing. Berlucchi said the agents did not even need to show him the rest.

RESTRICTED INFORMATION   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General.  This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General.  Unauthorized release may result in criminal prosecution.

SA Cloninger explained there were just a few more to go over and wanted to make sure the agents were clear on the process. Berlucchi agreed to review additional jobs presented by the agents.

SA Cloninger showed Berlucchi a completed Horizon job packet containing Horizon invoice 31-9/17 dated December 1, 2017 (**Attachment 7**). The job related to parking lot painting at the Marquette, MI Post Office. SA Cloninger noted in Rymar's proposal that he had subcontractor costs of $7,400 with ▓▓▓▓▓▓▓. That subcontractor cost was carried over to the invoice, creating a total invoice price of $9,158. SA Cloninger showed Berlucchi invoice number 9992 dated October 31, 2017, from ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ for general contracting at the Marquette, MI Post Office (**Attachment 8**). Berlucchi confirmed the description appeared to be the same parking lot painting job covered by Horizons. SA Cloninger noted the cost billed by ▓▓▓▓▓▓ was approximately $3,700.

SA Cloninger asked Berlucchi if he would have approved Horizons invoice for $9,158 if he knew the subcontract costs were only $3,700. Berlucchi stated "no" and that the $3,700 should be the amount invoiced. Berlucchi stated the subcontractor amount submitted by Rymar on the proposal and invoice was important and he relied on the amount provided by Rymar. Berlucchi expected to know the real cost of the subcontractor and that would have had an impact on his decision. SA Cloninger explained the term of material to a decision to Berlucchi. Berlucchi stated the subcontractor amount was material to the overall invoice and he used that in his decision. Berlucchi stated "not that I recall" about ever telling Rymar to add costs to his invoice.

SA Cloninger showed Berlucchi Horizons invoice 30-9/17 dated December 1, 2017, in the amount of $9,835 for work at the Iron River, MI Post Office (**Attachment 9**). SA Cloninger showed Berlucchi ▓▓▓▓▓▓▓ invoice 9968 dated October 6, 2017, for $3,900 (**Attachment 10**). Berlucchi stated he would not have approved the invoice and payment for Horizons if he knew the job only cost $3,900.

SA Cloninger showed Berlucchi Horizons invoice 5-9/17 dated May 5, 2017, in the amount of $9,975 for work at the Sagola, MI Post Office (**Attachment 11**). SA Cloninger showed Berlucchi ▓▓▓▓▓▓▓▓▓▓ invoice 9557 dated October 31, 2017, for $5,322.53 (**Attachment 12**). Berlucchi stated he would not have approved the invoice and payment for Horizons if he knew the job only cost $5,300. Berlucchi stated he never told Rymar or any contractors to add money to a proposal or invoice to cover other costs. Berlucchi said he is going to buckle down and learn from this.

SA Cloninger showed Berlucchi Horizons invoice 32-9/17 dated September 5, 2017, in the amount of $9,482 for work at the Iron Mountain, MI Post Office (**Attachment 13**). SA Cloninger showed Berlucchi ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ invoice 9969 dated October 6, 2017, for $4,200 (**Attachment 14**). Berlucchi stated he would not have

**RESTRICTED INFORMATION**   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

approved the invoice and payment for Horizons if he knew the subcontracting only cost $4,200.

Berlucchi stated he picked Rymar for these jobs because they built a relationship and at some point Berlucchi was concerned with "too much Mike." Berlucchi stated he has given him a lot of jobs so he tried to spread the wealth. Berlucchi noted all these guys have families. Berlucchi confirmed he is the sole decision maker on where to assign the jobs that come to him that are under $10,000. Berlucchi noted with some other contractors, but not with Rymar, he has had to put things on a different invoice to make a project under $10,000.

Berlucchi stated he did ask Rymar to help him with something. Berlucchi stated he needed help with a subcontractor for ▓▓▓▓. ▓▓ did a septic tank related job in the UP and did not pay one of its' subcontracted electricians. Berlucchi received the complaint about the subcontractor from the clerk at the Post Office. Berlucchi talked to ▓▓ at ▓▓ and asked him to pay his subcontractor. ▓▓ refused and said the subcontractor should not be paid based on his work. Berlucchi could not recall the name of the subcontractor or the name of the post office where the septic work was completed. Berlucchi stated he just threw out all the paperwork related to the matter last week.

Since ▓▓ would not pay the $1,400 to the subcontractor, Berlucchi asked Rymar to pay him. Berlucchi instructed Rymar to add $1,400 to one of his invoices and then pay the subcontractor with a check from Horizons. Berlucchi estimated this happened about six to eight months ago. Berlucchi stated when he asked Rymar if he could help him, Rymar told him, "Yeah, I'll take care of him, no problem."

SA Cloninger asked Berlucchi if it was an ▓▓ job, why wouldn't ▓▓ be responsible for paying the subcontractor. Berlucchi stated ▓▓ refused to pay the subcontractor and the Postal Service pays its' contractors, so he had Rymar add the $1,400 to an invoice and instructed him to pay the subcontractor. Berlucchi stated maybe he did not follow the proper management process. Berlucchi stated the additional money to Rymar and Horizons would not show up in eFMS because Berlucchi added it to a different call and "buried it." Berlucchi stated, "That's on me. I did something wrong. That's the only thing I did wrong." Berlucchi stated that was the only call he did that on and no others.

Berlucchi stated the subcontractor told him Berlucchi could pay him through a bar, but he did not take credit cards. Berlucchi did not want to pay a contractor through a bar, so he paid the $1,400 through Rymar.

Berlucchi said he could find the ▓▓ job by looking on his computer. The agents helped Berlucchi review prior jobs in eFMS in an effort to identify the ▓▓ job. The agents even searched a database maintained by SA Cloninger of all Berlucchi jobs. After

Page 12

**RESTRICTED INFORMATION** — This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

extensive searching, Berlucchi could not recall the ▆▆▆ job, but said it was a small two-hour Post Office in the UP that he had not done work at before.

Berlucchi stated he knows Rymar outside of work as well. Berlucchi stated he has been friends with Rymar for many years, but it has no bearing on what he does in his postal job. Berlucchi never verified the costs Rymar paid his subcontractors. Rymar never told Berlucchi that he was paying his subcontractors less than he was billing the Postal Service for. Berlucchi has known Rymar for years, since about 1991. Rymar did a job for ▆▆▆ in Pontiac, MI when he was with American Material Handling. Berlucchi was the maintenance manager there. Berlucchi stated he and Rymar are friends, but not close, and he calls him in the evenings sometimes. Berlucchi said it's been a while since the last time they talked outside of work.

SA Cloninger asked Berlucchi if he ever requested an ethics review by the postal law department about his relationship with Rymar. Berlucchi stated he never did. SA Cloninger asked Berlucchi if he ever took any weekend trips with Rymar. Berlucchi stated, "hell no." Berlucchi stated he never asked Rymar to help with repairs on his personal home in Troy, MI or his cabin in the Atlanta, MI area.

Berlucchi explained he runs the Historic Fort Wayne Coalition (HFWC) that maintains the fort grounds and does civil war reenactments. The HFWC runs the former military grounds in the Detroit area and is a non-profit. Rymar has walked the grounds of the fort with Berlucchi, but Rymar does not participate in the civil war reenactments. Berlucchi stated all the funding for the fort goes through him. Berlucchi stated the fort is funded through parking and gate fees and there are no big donors. Berlucchi stated Rymar is a member of the HFWC and pays his dues. Berlucchi stated Rymar has never made any large donations to the HFWC.

SA Cloninger showed Berlucchi Horizons PNC Bank check number 2760 dated November 3, 2015, payable to the Historic Fort Wayne Coalition, in the amount of $5,000, signed by ▆▆▆ Rymar (**Attachment 15**). Berlucchi stated that was a pass-through cost and the HFWC contracted with Wayne State to do a non-invasive sonar ground penetration to map what was under the ground there. Berlucchi stated he now remembers the check and Rymar said he could help with the non-invasive ground study. Berlucchi stated there would be a check to Wayne State for $5,000 for the service. Berlucchi stated he never thought a donation to an organization that he runs would influence his decision in his postal position. Berlucchi stated it did not influence his decision making.

Berlucchi stated the fort was closed before he took over and he has worked hard to keep it running. It took Berlucchi nine years to get the Native American community to check the mounds on the fort. The burial ground was falling and Berlucchi wanted to respect their culture with the non-invasive search. Berlucchi funded the study to look for an Indian village under the grounds. Previous digs at the site found Indian bones.

**RESTRICTED INFORMATION**  This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Berlucchi used the sonar to see what was all there. The City of Detroit benefited from this, not Berlucchi. Berlucchi stated there were no other checks from Rymar to HFWC that he could remember.

Berlucchi stated Rymar helped with a water line break at the fort. Rymar sent out Lee the plumber and Lee helped with the repair. The members also helped with the repair labor and Lee provided his expertise. The HFWC coalition was not charged for the repair and Berlucchi looked at it as a favor from a HFWC member, Rymar. Berlucchi stated he needed Rymar in the UP to help with those jobs and nothing Rymar did at the fort benefited him with the postal jobs.

SA Cloninger asked Berlucchi if there was anything else between him any Rymar and this was the time and his chance to explain everything. Berlucchi stated he could not remember anything else.

SA Cloninger showed Berlucchi Horizons PNC Bank check number 3494 dated December 9, 2016, payable to the Historic Fort Wayne Coalition, in the amount of $5,000, signed by ▓▓▓▓ Rymar (**Attachment 16**). Berlucchi stated that was a cash donation out of Rymar's own goodwill. Berlucchi stated he did not ask for it or solicit it. Rymar just made the donation on his own.

SA Cloninger asked Berlucchi why he has not used Rymar since April 16 following the records request. Berlucchi stated he knew something was going on after the request. Berlucchi stated he and ▓▓▓▓ talked about the request and thought it was strange. SA Cloninger asked Berlucchi if ▓▓▓▓ went on any trips with Rymar and Berlucchi stated no.

SA Cloninger asked Berlucchi if Rymar ever paid for a hotel room from Berlucchi and Berlucchi stated no. SA Cloninger asked Berlucchi if Rymar ever paid for a trip for Burlucchi and Burlucchi stated no. SA Cloninger asked if Rymar ever took him on a trip to Northern Michigan and Berlucchi replied no.

SA Cloninger asked Berlucchi if he ever went pheasant hunting with Rymar. Berlucchi stated he did go pheasant hunting with Rymar, but Berlucchi stayed at Berlucchi's place and paid Rymar $150 in cash for the hunting. ▓▓▓▓ went too and he also paid Rymar cash for the hunting. ▓▓▓▓ a postal letter carrier, went too. Berlucchi stated he also took his son ▓ on the trip, but ▓ did not hunt. Berlucchi estimated this hunt took place about three to four years ago.

Berlucchi stated ▓▓▓▓ stayed with Rymar at Rymar's cabin for the weekend. Rymar's cabin hosted the pheasant hunt. Berlucchi first stated he stayed at his own place in Atlanta, MI, but then stated he stayed at Rymar's cabin on Friday night and at his cabin in Atlanta on Saturday night. SA Cloninger showed Berlucchi email

Page 14

RESTRICTED INFORMATION   This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

correspondence between Rymar, ▇, and Berlucchi about the hunting trip (**Attachment 17**).

Berlucchi stated they all drove separate vehicles. Berlucchi stated he did not think he stayed for the Sunday breakfast. Berlucchi stated he paid Rymar $150 in cash and that was the total cost for the hunt. When asked if there would be a bank transaction around the time of the trip, Berlucchi stated there should be around a $200 withdrawal from his account.

Berlucchi stated he did not give Rymar any work because of the trip or donations to HFWC. Berlucchi tried to give the facility repair jobs to the people who would do the best job. Berlucchi stated he is going to have to resign from the HFWC. Berlucchi stated he never gave Rymar anything. Berlucchi stated he has worked a long life and he is going to lose his retirement. Berlucchi stated he never did anything to hurt the Postal Service. Berlucchi explained he was blown up by a bomb for this place.

Berlucchi stated he did not solicit any of this, Rymar just gave it to him. Berlucchi stated he would do whatever he could to cooperate. Berlucchi stated that he has been honest and he was honest about the $1,400 to Rymar. SA Cloninger explained to Berlucchi this is the time to be honest about everything. SA Cloninger showed Berlucchi a credit card authorization from Rymar to Berlucchi for a hotel room at the Sleep Inn in Midland, MI. Berlucci stated, "Shit yeah, I forgot about that." Berlucchi stated Rymar paid for the hotel room for a civil war conference that he and his son ▇ attended. Berlucchi said "wait a minute" and then recalled the hotel room in Midland, MI was for the Special Olympics. Berlucchi's daughter made the Special Olympics and he wanted to go. Rymar paid for the hotel room for the Special Olympics trip.

Berlucchi agreed that Rymar gave Berlucchi favors, but when asked if Rymar believed those favors helped him get work from Berlucchi, Berlucchi stated, "I hope not, I pray not." Berlucchi stated he never saw the subcontracting costs and now it "looks like shit" that the invoices were inflated. Berlucchi stated he did not feel obligated to give Rymar work.

Berlucchi stated he did not feel that he owed Rymar anything. Berlucchi thought it was friends being friends. Berlucchi stated the agents had his head spinning. Berlucchi asked if he needed an attorney. Berlucchi stated he has no money and his bank account is a mess. SA Cloninger told Berlucchi that he cannot answer that for him and that is his choice and he can request an attorney at any time. SA Shields explained an attorney can be provided based on financial need. Berlucchi agreed to continued questions without an attorney.

Berlucchi stated he did not think he owed Rymar anything and they just knew each other. When asked if Rymar ever gave him cash, Berlucchi stated, "None, Never, No, No." Berlucchi stated Rymar never paid any of his bills. Berlucchi stated Rymar never

**RESTRICTED INFORMATION**  This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General.  This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General.  Unauthorized release may result in criminal prosecution.

==did any repair work on his house in Troy and said his house if falling apart. Berlucchi stated Rymar never did any repair work on his cabin in Atlanta.==

SA Cloninger asked Berlucchi about anything from other contractors. Berlucchi did not recall anything. SA Cloninger showed Berlucchi a HFWC donation form to ▓▓▓▓ at ▓▓▓▓▓▓ for $2,785 for dumpsters and construction materials dated March 8, 2013 (**Attachment 18**). Berlucchi stated ▓▓ did do work at the fort and provided materials. ▓▓ received a donation form and they were not paid for the services. Berlucchi stated ▓▓ helped at the fort every year. Berlucchi stated that ▓▓▓▓ from ▓▓▓▓▓ and ▓▓▓▓ from ▓▓▓▓ also did work or donated supplies at the fort. All those contractors received donation forms. Berlucchi stated he can provide those forms as they are maintained by the accountant for the HFWC.

Berlucchi stated none of the other postal contractors completed work on his home in Troy or on his cabin in Atlanta. Berlucchi stated he never received cash from any postal contractors.

Berlucchi declined to provide a sworn statement. Berlucchi stated the agents have all the information and he cannot think of anything else. Berlucchi stated he is losing his job. SA Cloninger explained to him that is not the agents' decision and the information will be provided to postal management and the United States Attorney's Office. Berlucchi stated he understands the agents are doing their jobs and he has worked with Postal Inspectors before.

Berlucchi stated he never thought he was hurting the Postal Service. Berlucchi never saw those overages from Rymar on his subcontractors, but stated, "Hell yeah it's important." Berlucchi stated he never said to Rymar that he would not give him postal work for the donations, but he never said that he would either. Berlucchi could not believe he would do this to his family. Berlucchi stated it looks like he took those things from Rymar and then there were overages and he looks like a criminal. Berlucchi stated he got no benefit from the contractors. Berlucchi stated he is not a wealthy guy. His house is falling apart, he has old cars, he has an old boat that he got when he was married, and could barely come up with $300 for this week.

SA Cloninger asked if he took the annual ethics training with his postal position. Berlucchi stated he took the ethics trainings every year and now they were going to use that against him. Berlucchi said he would just click the buttons so fast. Berlucchi stated he did not benefit from any of this, but the appearance it looks like he did. Berlucchi stated he is a bottom feeder and he never thought he was doing anything criminal.

Berlucchi asked the agents if they know any attorneys. SA Cloninger advised Berlucchi that the agents cannot recommend any attorneys. Berlucchi kept speaking after SA Cloninger advised him and said he has taken care of the Postal Service. Berlucchi stated he took a bomb for the Post Office. Berlucchi was working at the Royal Oak, MI

**RESTRICTED INFORMATION**    This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Post Office on tax day in 1991. He was there at night before the cutoff and there was a lot of people and publicity there. Berlucchi noticed smoke coming out of a collection hamper for federal returns. Berlucchi reached in the hamper and saw a small package that was smoking and an ignition line was going back and forth up the parcel. Berlucchi grabbed the parcel and put it against his chest and warned everyone there was a bomb. Berlucchi tried to get away from the crowd and found a pothole. Berlucchi threw the parcel in the pothole and tried to kick it open with his boots. There was a small amount of water in the pothole and Berlucchi could smell the phosphorus. The bomb still went off and threw Berlucchi from the area. He did not suffer severe injuries and did not file a workers' compensation claim. Berlucchi said he took a week off and returned to work.

Berlucchi provided the following contact information:

Following the interview, the agents collected postal documents from Berlucchi's office. Berlucchi assisted the agents to show them where all the documents were stored.

Attachments

| **PREPARED BY:** SA KEVIN CLONINGER | **DATE:** 7/5/2018 |

Page 17